"The general principle in the construction of instruments of this character is well settled—that an additional liability will not be imposed upon a tenant unless it is clearly within the provisions of the lease; but 'it has been held in many cases that the court will so construe a lease as to carry out the intention of the parties if possible.' Buchanan v. Whitman, 151 N. Y. 253 [45 N. E. 556]."

In view of the fact that during the first 11 years of the lease the taxes were imposed in September and due in October, it is at least a natural query whether it would not be contrary to the evident intention of the parties to compel payment of 16 annual taxes while the lease demised a term of only 15 years. Nor must the fact be wholly overlooked that the new lease, which commenced on May 1, 1914, expressly requires the tenant to pay "the annual taxes for the entire year of 1914." I therefore hold that any breach of the covenant in this case to pay the taxes imposed when due could not occur until May 1, 1914. The defendant was merely an assignee of the lease. His liability to the landlord for a breach of covenants running with the land, such as the covenant to pay taxes, rested on privity of estate and not on privity of contract. "The assignee is only liable for a breach of covenant which occurs while he is the owner of the term." McKeon v. Wendelken, 25 Misc. Rep. 711, 713, 55 N. Y. Supp. 626, 627. The lease was surrendered April 30, 1914. The tax became due May 1, 1914. The plaintiffs cannot hold the defendant liable for his failure to pay a tax which became due and payable after privity of estate between him and the plaintiffs had terminated.

Motion for judgment on the pleadings denied, with costs.

Motion denied, with costs.

---

BLAU v. CITY OF NEW YORK. (No. 6855.)

(Supreme Court, Appellate Division, First Department. February 19, 1915.)

1. MUNICIPAL CORPORATIONS (§ 192*)—EMPLOYÉS—SALARIES—CONSTRUCTION OF RESOLUTION.

In April, 1902, the board of estimate and apportionment of New York City fixed the salary of inspector of tenements at $1,200 a year. The municipal civil service commission subsequently adopted a general classification of positions in the competitive class, and placed the position of tenement house inspector under a schedule embracing grades fixed according to salary; the difference between the minimum of each grade being $150. In March, 1903, pursuant to a letter from the tenement house commissioner stating that it was desirable to have intermediate grades, so that men might be promoted from $1,200 to $1,350, without promoting them two grades at one step, and therefore requesting that salaries be fixed in such amounts, the board of estimate and apportionment adopted a resolution providing "that the salaries of the following employés in the tenement house department be fixed as follows: Inspectors of tenements, per annum, $1,350; inspectors of tenements, per annum, $1,650; inspectors of tenements, per annum, $1,800." Held, that this resolution was meaningless, unless resort was had to the various existing grades established by the civil service commission, but, when considered in connection therewith and with the letter from the tenement house commissioner, did not fix the minimum salary for tenement house inspector at $1,350, but

merely created three additional rates of compensation, to enable the commissioner to carry into effect his scheme of promotion.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 530–532; Dec. Dig. § 192.*]

2. MUNICIPAL CORPORATIONS (§ 192*)—EMPLOYÉS—SALARIES—CONSTRUCTION OF RESOLUTION.

If there was any doubt as to the meaning of such resolution, it was removed by the practical construction placed thereon, where over 200 inspectors accepted appointment at $1,200 a year and received that salary for years without protest, the tenement house commissioner acted upon the assumption of the existence of a $1,200 rate of compensation by carrying such inspectors on the pay roll and by asking for appropriations upon that basis, the board of estimate and apportionment and the board of aldermen concurred in such interpretation of the resolution by their annual appropriations, and the municipal civil service commission followed a uniform practice of holding examinations for the position of inspector and announcing the grade at a compensation of $1,200 annually.

 [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 530–532; Dec. Dig. § 192.*]

Appeal from Trial Term, New York County.

Action by Henry Blau against the City of New York. From a judgment dismissing the complaint, plaintiff appeals. Affirmed.

The opinion of Greenbaum, J., in the court below, was as follows:

This action is brought by plaintiff, as assignee of Julius Simpson, to recover the sum of $912.50, alleged to be due his assignor as an inspector in the tenement house department of the city of New York from March 25, 1906, to April 25, 1912, being the difference between the amount of salary paid to him at the rate of $1,200 per annum and the amount to which he claims he was entitled at the rate of $1,350 per annum. The plaintiff's assignor was notified on September 21, 1905, by the municipal civil service commission of his appointment of tenement house inspector, with a yearly salary of $1,200, after having been previously notified of his appointment at the same salary by the tenement house commissioner by letter dated September 11, 1905. By a resolution of the board of estimate and apportionment, adopted April 30, 1902, pursuant to section 10 of the Greater New York Charter (Laws 1901, c. 466) the salary of tenement house inspector was fixed at $1,200 per annum. Thereafter, on February 13, 1903, by resolution of the board of estimate and apportionment, passed February 13, 1903, concurred in by the board of aldermen March 3, 1903, and approved by the mayor March 9, 1903, it was provided "that the salaries of the following employés in the tenement house department be fixed as follows: Inspectors of tenements, per annum, $1,350; inspectors of tenements, per annum, $1,650; inspectors of tenements, per annum, $1,800." The passage of this resolution was preceded by a written communication from the tenement house commissioner, dated February 7, 1903, requesting the board of estimate and apportionment to fix the salaries of such employés in said amounts. This letter contained the following statement: "We find it desirable in the department to have these intermediate grades. Your honorable board fixed the salaries of inspectors of tenement houses in April, 1902, at $1,200 and $1,500. It is now, however, considered desirable to have these intermediate grades, so that we may promote men from $1,200 to $1,350, without the necessity of promoting them at one step two grades." On July 11, 1902, the position of inspector was included in the graded class, and continued as such until December 4, 1903, when it was taken therefrom and placed in the ungraded class. This latter classification remained in effect until November 10, 1909, when the position was again graded according to the amount of annual compensation by the creation of six grades, as follows: Grade 1, including employés earning $900; grade 2, including employés earning $1,200; grade 3, including employés earning $1,500; grade 4, including employés earning $1,800; grade 5, including employés earning $2,400;

grade 6, including employés earning $3,000. This classification has continued in effect until the present time. The plaintiff claims that he was entitled to the minimum salary of $1,350, fixed by the resolution of the board of aldermen on March 3, 1903, with the approval of the mayor. During the entire period of his employment plaintiff's assignor was paid at the rate of $1,200 per annum and receipted in full therefor on the pay rolls of the department. He never protested against the payment to him of this amount of $1,200, and never took any action or proceeding to obtain an adjudication that he was entitled to any greater salary than that paid to him. During all this period there were several hundred inspectors of tenements in the employ of the department, who were paid salaries at the rate of $1,200 per year, and the tenement house commissioner never asked for any appropriations with which to pay Simpson or any other of the inspectors who were receiving salaries at the rate of $1,200 per year in excess of that rate, and it appears that the payment to Simpson and the other said inspectors similarly situated would, at the rate of $1,350 per annum, be in excess of the amounts appropriated to pay Simpson and said other inspectors.

[1] The question presented involves the construction of the resolution of the board of aldermen of March 3, 1903. At the outset it should be borne in mind that when this resolution was adopted tenement house inspectors were in the graded class, and that section 15 of the Civil Service Law (Laws 1899, c. 370; Consol. Laws, c. 7) provided that promotions shall be based on merit and competition, and that for the purposes of the section "an increase in the salary or other compensation of any person holding an office or position within the scope of the rules in force hereunder beyond the limit fixed for the grade in which such office or position is classified shall be deemed a promotion." The resolution of the board of aldermen designates three different rates of annual salary for similar positions, and it would be meaningless unless resort is had aliunde to the various existing grades established by the civil service commission applicable to the position of tenement house inspectors. Under the stipulated facts in this case it appears that on April 30, 1902, the salary of inspector of tenements was fixed by the board of estimate and apportionment at $1,200 per annum. On July 11, 1902, the municipal civil service commission adopted a general classification in which it provided that positions in the competitive class should be included in four schedules, designated respectively B, C, D, and E, and that the first three of such schedules should contain those positions that were graded, and that "promotion from the lower grades to the higher should be on the basis of ascertained merit, seniority of service and examination. * * *" Under this classification the position of tenement house inspector was placed by the civil service board in the competitive class under schedule D, which embraced 16 grades, fixed according to salary paid, and running from $750 to $3,000 or over; the difference between the minimum amount of each grade being $150. The subsequent resolution of the board of aldermen of March 3, 1903, already referred to, fixed the salaries of inspectors of tenements at $1,350, $1,650, and $1,800. It would seem clear from the situation thus presented, when considered in connection with the letter of the tenement house commissioner of February 7, 1903, that this resolution of the board of aldermen was not designed to fix the minimum salary of the position of tenement house inspector, but to establish additional salaries for that position in harmony with the grades created by the civil service board on July 11, 1902, by creating three additional rates of compensation, in order to enable the commissioner to carry into effect the scheme of promotion outlined in his letter of February 7, 1903.

[2] But it seems to me that any doubt as to the meaning of the resolution must be resolved, when one considers the practical construction placed thereon, not only by the plaintiff's assignor and upwards of 200 others similarly situated, who accepted appointment at $1,200 per year and thereafter for years, without protest or demur, received this salary, but by every officer of the city who was charged with any duty in relation to this matter. The tenement house commissioner acted upon the assumption of the existence of a $1,200 rate of annual compensation, not only with respect to the plaintiff's assignor, but in carrying on his pay rolls the compensation of 200 or more inspectors at the same time, and by annually during the entire period covered by plaintiff's claim asking for appropriations upon this basis. Then we find the in-

variable concurrence of the board of estimate and apportionment and the board of aldermen in the commissioner's interpretation of the resolution by their annual grants of appropriations, and the uniform practice during this period on the part of the municipal civil service commission of holding examinations for the position of inspectors of tenements and announcing the grade at a compensation of $1,200 annually. The "practical construction of a statute by those for whom the law was enacted, or by public officers whose duty it is to enforce it, acquiesced in by all for a long period of time, is of great importance in its interpretation in a case of serious ambiguity." Grimmer v. Tenement House Dept. of the City of N. Y., 205 N. Y. 549, 550, 98 N. E. 332. The case of People ex rel. Stokes v. Tully, 108 App. Div. 345, 95 N. Y. Supp. 916, 1153, upon which plaintiff relies, differs materially from this case in essential facts. The resolution there under consideration increased the salary of the position of examiner of charitable institutions, which was in the ungraded class, and for which there was but a single rate of compensation. It was held under the circumstances that in view of the ungraded character of the position the increase of salary did not constitute a promotion, and that the resolution operated to increase the compensation of all those holding that position. Furthermore, the resolution in the Stokes Case was not ambiguous in meaning, and therefore no question of practical construction was involved.

The complaint must be dismissed upon the merits.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, SCOTT, DOWLING, and HOTCHKISS, JJ.

J. T. Loew, of New York City, for appellant.
T. Farley, of New York City, for respondent.

PER CURIAM. Judgment affirmed, with costs, on opinion of Greenbaum, J. Order filed.

---

STIEBEL et al. v. LISSBERGER. (No. 6799.)

(Supreme Court, Appellate Division, First Department. February 19, 1915.)

1. GAMING (§§ 11, 12*)—SPECULATIONS—STOCKS FOR FUTURE DELIVERY.
   Where a customer's transaction with a stockbroker was not a bona fide transaction, but merely a cover for a bet upon the future price of a certain stock, made in the broker's presence and with his knowledge, and where the broker, without notice to the customer, purchased stocks which the customer ordered to be sold, and sold stock which he ordered to be bought, the transactions created no liability on the part of the customer.
   [Ed. Note.—For other cases, see Gaming, Cent. Dig. §§ 19–23, 26; Dec. Dig. §§ 11, 12.*]

2. BILLS AND NOTES (§ 103*)—FRAUD IN ORIGINAL TRANSACTION—EFFECT.
   Where an account stated is successfully impeached for fraud, notes given in consideration of the account furnish no better basis for their recovery than does the account itself.
   [Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 233–240; Dec. Dig. § 103.*]

3. PAYMENT (§ 86*)—VOLUNTARY PAYMENT—RECOVERY.
   A customer, who gave his notes to his stockbroker and paid thereon in reliance upon the accuracy of a general account, which was in fact fraudulent, was entitled to recover back the amounts paid, since the payment could not be considered as voluntary.
   [Ed. Note.—For other cases, see Payment, Cent. Dig. § 282; Dec. Dig. § 86.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes